# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| JERRY J. EACHOLES,<br>    Petitioner, | Case No. 1:16-cv-373 |
| vs. | Black, J.<br>Wehrman, M.J. |
| WARDEN, SOUTHEASTERN<br>CORRECTIONAL INSTITUTION,<br>    Respondent. | **REPORT AND<br>RECOMMENDATION** |

Petitioner, an inmate in state custody at the Southeastern Correctional Institution, through counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the petition, respondent's return of writ, and petitioner's reply. (Docs. 1, 5, 13). For the reasons stated below, the undersigned recommends that the petition be denied.

## I. PROCEDURAL HISTORY

### State Trial Proceedings

On December 6, 2012, the Butler County, Ohio grand jury returned an eight-count indictment charging petitioner with one count each of murder, aggravated burglary, aggravated robbery, and having weapon under disability. (Doc. 5, Ex. 1). The murder, aggravated burglary, and aggravated robbery all contained firearm specifications.

Petitioner filed a motion to dismiss the firearm specifications, arguing that he could not be found guilty of the specifications on a theory of complicity. (Doc. 5, Ex. 2). On July 24, 2013, the trial court denied petitioner's motion. (Doc. 5, Ex. 3).

The case proceeded to trial. Petitioner filed a Rule 29 motion for acquittal, which was denied by the trial court. (*See* Doc. 5, Ex. 10, ¶12). Petitioner was subsequently found guilty of

murder, aggravated burglary, and aggravated robbery. (Doc. 5, Ex. 6). The jury found petitioner not guilty on the firearm specifications and the charge of having weapons while under disability.

On October 21, 2013, petitioner was sentenced to prison terms of fifteen years to life for the murder conviction and ten years for the aggravated burglary conviction, to be served consecutively. (*See id.*). The trial court merged the aggravated robbery conviction for the purpose of sentencing upon finding that it was an allied offense of similar import to murder, resulting in a total aggregate prison sentence of twenty-five years to life in the Ohio Department of Rehabilitation and Corrections.

**Direct Appeal**

Petitioner, through counsel, filed a timely notice of appeal to the Ohio Court of Appeals. (Doc. 5, Ex. 7). Petitioner raised the following two assignments of error in his appellate brief:

1. The trial court erred to the prejudice of appellant by permitting the introduction of co-conspirator hearsay statements without the State presenting independent proof of the conspiracy.

2. The State's evidence was constitutionally insufficient to support convictions for murder, aggravated burglary, and aggravated robbery.

(Doc. 5, Ex. 8). On September 15, 2014, the Ohio Court of Appeals affirmed the judgment of the trial court. (Doc. 5, Ex. 10).

On December 17, 2014, petitioner filed a "notice of pro-se appearance," indicating that petitioner would represent himself in all future pleadings. (Doc. 5, Ex. 11). Petitioner also requested that the appeals court grant him an extension of time to file an application to reopen his appeal pursuant to Ohio App. R. 26(B) and to order his appellate counsel to provide him with transcripts. (*See* Doc. 5, Ex. 12). The court denied petitioner's motions on December 29, 2014. (Doc. 5, Ex. 15).

## Ohio Supreme Court

Meanwhile on October 28, 2014, petitioner, through counsel, filed a timely notice of appeal to the Ohio Supreme Court. (Doc. 5, Ex. 16). In his memorandum in support of jurisdiction, petitioner raised the following two propositions of law:

I. Co-conspirator statements are inadmissible under Evid.R. 801(D)(2)(e), and violate a Defendant's Constitutional Rights to Due Process, Confrontation and a Fair Trial.

II. The bare testimony of a convicted felon that a defendant conspired with her and others to commit those felonies is insufficient to establish beyond a reasonable doubt that he was guilty of those felonies in the complete absence of any evidence that he planned, participated in, or assisted the others in any manner.

(Doc. 5, Ex. 17). On March 11, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal. (Doc. 5, Ex. 21).

## Federal Habeas Corpus

Petitioner, through counsel, filed the instant federal habeas corpus action. (Doc. 1). Petitioner raises one ground for relief in the petition:

> **GROUND ONE**: The State elicited insufficient evidence to convict Eacholes of complicity to murder, complicity to burglary, and complicity to aggravated robbery. Specifically, there was insufficient evidence to show that Eacholes acted to purposely facilitate the murder, burglary, and aggravated robbery. There was insufficient evidence to show that Eacholes knew that his co-defendants possessed guns for use in the offenses. And there was insufficient evidence to show that Eacholes had foreknowledge of the guns used by co-defendants in the offenses.

(Doc. 1 at PageID 2).

Respondent has filed a return of writ in opposition to the petition. (Doc. 5). According to respondent, petitioner's sole ground for relief is without merit.

On August 4, 2016, petitioner filed a traverse and motion to submit a state-law question

3

to the Ohio Supreme Court.[1] (Doc. 12). The Court denied the motion on March 29, 2017. (Doc. 15).

## III. THE PETITION SHOULD BE DENIED

In this federal habeas case, the applicable standard of review governing the adjudication of constitutional issues raised by petitioner to the state courts is set forth in 28 U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412–13 (2000)). "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 599–600 (quoting *Williams,* 529 U.S. at

---

[1] Petitioner sought to certify the following question to the Ohio Supreme Court: Under Ohio law, does complicity liability under R.C. 2923.03(A) require the State to prove that the defendant: (i) had foreknowledge of the underlying offense, (ii) possessed the culpable mental state borrowed from the underlying offense regarding his complicitous act, and (iii) intended to facilitate the underlying offense? (*See* Doc. 13). Respondent opposed certification on the ground that even if the Ohio Supreme Court answered the certified question in petitioner's favor, that the evidence submitted at trial was sufficient to demonstrate that petitioner had foreknowledge of the weapon and was complicit in the commission of the offenses. (*See* Doc. 14). The undersigned denied the motion, noting that it did not appear that certification was warranted. (Doc. 15). For the reasons stated herein, the undersigned reaffirms that certification to the Ohio Supreme Court is not necessary for the adjudication of the petition.

4

413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet. *Id.* at 600. As the Sixth Circuit explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g., Cullen v. Pinholster,* __ U.S. __, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*. . . . This is a "substantially higher threshold.". . . To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter,* __ U.S. __, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original). The Supreme Court recently extended its ruling in *Harrington* to hold that when a state court rules against a defendant in an opinion that "addresses some issues but does not expressly address the federal claim in question," the federal habeas court must presume, subject to rebuttal, that the federal claim was "adjudicated on the merits" and thus subject to the "restrictive standard of review" set out in § 2254(d). *See Johnson v. Williams*, __ U.S. __, 133 S.Ct. 1088, 1091 (2013).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 131 S.Ct. at 786. In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that

5

there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87.

The Supreme Court has made it clear that in assessing the merits of a constitutional claim under § 2254(d), the federal habeas court must apply the Supreme Court precedents that controlled at the time of the last state-court adjudication on the merits, as opposed to when the conviction became "final." *Greene v. Fisher*, __ U.S. __, 132 S.Ct. 38, 44–45 (2011); *cf. Otte,* 654 F.3d at 600 (citing *Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases already decided at the time the state court made its decision"). In *Greene*, 132 U.S. at 44, the Court explained:

> [W]e held last term in *Cullen v. Pinholster*, 563 U.S. __, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits. We said that the provision's "backward-looking language requires an examination of the state-court decision at the time it was made." *Id.*, at __, 131 S.Ct. at 1398. The reasoning of *Cullen* determines the result here. As we explained, § 2254(d)(1) requires federal courts to "focu[s] on what a state court knew and did," and to measure state-court decisions *as of 'the time the state court renders its decision.'" Id.*, at __, 131 S.Ct. at 1399 (quoting *Lockyer v. Andrade,* 538 U.S. [at] 71-72 . . .; emphasis added).

Decisions by lower courts are relevant "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte*, 654 F.3d at 600 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010), *cert. denied,* 132 S.Ct. 127 (2011)). The writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,* 529 U.S. at 412).

6

In his single ground for relief, petitioner contends that his convictions were not supported by sufficient evidence. On direct appeal, the Ohio Court of Appeals was the only state court to issue a reasoned decision addressing the merits of petitioner's assignments of error challenging the sufficiency the evidence. The court provided the following summary of the testimony leading to petitioner's convictions and rejected his ground for relief, reasoning in pertinent part as follows:

> {¶ 2} On the evening of November 24, 2012, Julian Slaven was shot by burglars at his home in Fairfield, Ohio, and died shortly thereafter. Less than two weeks later, Eacholes and four others—Christia Frymire, Anthony Givens, Joseph Goodin, and Misty Williams—were indicted for murder, aggravated burglary, and aggravated robbery for the events at the Slaven home. Givens, Goodin, and Williams eventually entered guilty pleas. Eacholes and Frymire continued to maintain they were not guilty, and their causes proceeded to separate jury trials.
>
> {¶ 3} The state's first witness at Eacholes' trial was Williams. According to Williams, she, Eacholes, Frymire, Goodin, and Nicholas Lovell, met up at a club on the evening of November 22, 2012. They spent most of the next two days together drinking, smoking marijuana, and snorting heroin. By the early afternoon of Saturday, November 24, she, Goodin, and Lovell recognized they were nearly out of money. A few hours later, Williams overheard a conversation about money between Goodin, Lovell, and Eacholes, during which they discussed the possibility of committing a robbery. Williams and Frymire inserted themselves into the conversation and suggested a few potential targets. The group eventually agreed to rob Slaven, a small-time drug dealer and Williams' former high school sweetheart.
>
> {¶ 4} Williams testified that she then sent Slaven a text message to arrange a drug purchase. Slaven responded quickly, but indicated he would not be available until later that evening. Thereafter, the group went to Eacholes' residence on Ross Avenue in Hamilton where they were joined by Givens. It was there that the specifics of the plan for the robbery began to come together.
>
> {¶ 5} By Williams' account, the plan was for Williams and Frymire to meet Slaven at his home to purchase drugs, while Eacholes, Goodin, Givens, and Lovell waited outside. Williams stated that once she and Frymire were admitted into Slaven's home, she was then supposed to call Lovell to signal that they were ready for the robbery to begin. At the same time, Frymire was supposed to text Eacholes to tell him how many people were in the house. After the signal had been given:

7

> [Williams]: * * * Anthony Givens and Joseph Goodin were going to enter the resident [sic] with a—Joe was going to have the—gun in the back of [Frymire] while I sat in [Slaven's] room. And they were going to come up the stairs and make it look like a robbery that me and her had nothing to do with. And that [Goodin] and [Givens] were going to basically do like a stickup, scare [Slaven]. And [Eacholes] was going to come in and they were going to rob [Slaven] for everything he had.
>
> * * *
>
> [Prosecution]: So that was the plan?
> [Williams]: That was the plan.

{¶ 6} Williams also testified as to what actually transpired during the robbery, and how it ended in murder. Williams testified that on the night of the robbery, she rode in a van with Eacholes, Frymire, Goodin, Givens, and Lovell from Eacholes' residence to Slaven's house, with a brief stop at her apartment in between to pick up latex gloves. After she and Frymire entered Slaven's house, and in accordance with the plan, she made a call on her phone to signal that she was ready for the robbery to begin. While she was on her phone, Williams observed that Frymire appeared to be sending a text message from Frymire's phone.

{¶ 7} Williams further testified that after Givens and Goodin entered the home and threatened Slaven, Slaven tried to defend himself and was shot by Goodin. Williams stated that she and Frymire fled immediately, and that she saw Eacholes right by the door as she ran out of the house. Williams recalled that as she got in the back seat of the vehicle, Eacholes got in on the passenger side. Once all of the passengers were back in the vehicle and they started to pull away, Williams noted that Givens had a jar of marijuana in his hands. She said Eacholes, Goodin, and Givens divided that marijuana between themselves when the group returned to Eacholes' residence on Ross Avenue.

{¶ 8} The state called several other witnesses to corroborate Williams' account of Eacholes' role in the robbery and murder. Included among them was Paula Papke, a custodian of cell phone records for Cincinnati Bell, called to authenticate records for phone numbers registered to Slaven, Williams, and Frymire, respectively. Papke also authenticated records for two phone numbers registered to Edith Nicole Willis, Eacholes' former girlfriend and the mother of his children. Eacholes stipulated as to the authenticity, but not the admissibility, of the records.

{¶ 9} The cell phone records disclosed a number of things. The records revealed that Williams and Slaven traded several text messages beginning on the afternoon of November 24, 2012. They showed that, consistent with the plan described by Williams, a text message was sent at the approximate time of the Slaven robbery from a phone number registered in Frymire's name to a phone number registered

in Willis' name that was allegedly Eacholes' number. They demonstrated that several times prior to and after the murder, Willis had attempted to contact Eacholes at the same number that Frymire texted around the time she and Williams were in Slaven's home. And they showed that the phone number alleged to be Eacholes' was changed on November 25, 2012, the day following the robbery and murder.

{¶ 10} In addition, the state presented the testimony of Phillip Cook, a witness who arrived at Slaven's home during the robbery and was standing on Slaven's front porch as Givens and Goodin exited the house. Cook stated that when he pulled up to Slaven's home, he noticed two females leaving the house and heading toward a mini-van, as well as a male who had been in Slaven's front yard and who followed the girls to the vehicle. He indicated that the vehicle began moving so soon after the passengers got in that it was unlikely the male in the front yard or either of the two females would have been driving. Cook could not positively identify Eacholes as the male who had been in the yard. Yet, to explain his inability to make a positive identification, the state presented extensive evidence about the dim lighting in front of the Slaven home.

{¶ 11} Further, the state presented testimony of several witnesses suggesting a link between Eacholes and the jar of marijuana that Williams claimed Givens had stolen from Slaven. Officer Ryan Fleenor testified that in the weeks after Slaven's murder, he had been involved in executing a search warrant at Eacholes' residence. Officer Fleenor indicated that he found two glass jars in a trash can behind the residence. A series of experts from the Bureau of Criminal Investigations ("BCI") then testified that there was blood on at least one of the jars that was consistent with Slaven's DNA. They also testified that there were latent fingerprints on the jar that matched those on Givens' fingerprint card.

. . .

{¶ 28} In his second assignment of error, Eacholes argues that the state's evidence was not sufficient to support his conviction for murder, aggravated burglary, and aggravated robbery. He asserts that the state presented no direct or circumstantial evidence linking him to the crimes, or establishing beyond a reasonable doubt that he was aware of the plan to rob Slaven. We disagree.

{¶ 29} In reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. State v. Cox, 12th Dist. Clermont No. CA2008–03–028, 2009–Ohio–928, ¶ 25, citing State v. Thompkins, 78 Ohio St.3d 380, 386 (1997). Sufficiency of the evidence is a question of law, and the appellate court must be careful in its evaluation of the evidence not to substitute its own judgment of witnesses' credibility for that of the trier of fact. State v. Haley, 12th Dist. Butler No. CA2012–10–211, 2013–Ohio–4123, ¶ 6–7. "'The relevant inquiry is whether, after viewing the evidence in a

light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" Id. at ¶ 6, quoting State v. Jenks, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Proof beyond a reasonable doubt is "proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." R.C. 2901.05(E).

{¶ 30} After a thorough review of the record, we find that a reasonable jury could have found beyond a reasonable doubt that Eacholes was complicit in the offenses of murder, aggravated burglary, and aggravated robbery. As discussed above, the trial court, in its sound discretion, admitted Williams' testimony both implicating Eacholes in the planning of the robbery at Slaven's house, and placing Eacholes in the van on the way to Slaven's house and outside of Slaven's front door at the time of the robbery and murder. The state also presented evidence that during the robbery, a text message was sent from Frymire's phone to a phone that Eacholes' former girlfriend had used to contact him in the days leading up to the robbery and on the evening of the robbery. Further, the state presented evidence that a glass jar spotted with Slaven's blood and containing Givens' fingerprints was found in a trash can behind Eacholes' residence.

{¶ 31} Eacholes' second assignment of error is overruled.

(Doc. 5, Ex. 10 at PageID 99–108).

After review of the record in this case, the undersigned finds that petitioner is not entitled to habeas relief based upon his sufficiency of evidence claim. The clearly-established standard of review for evaluating the merits of constitutional claims challenging the sufficiency of the evidence was established by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). As the Supreme Court held in *Jackson*, because the Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense, *In Re Winship,* 397 U.S. 358, 363–64 (1970), "the relevant question" in assessing the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

Under the *Jackson* standard, the State is not required to rule out every hypothesis except

that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969–70 (6th Cir. 1983). It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson,* 443 U.S. at 319. Consequently, the reviewing court is not permitted to reweigh the evidence, reevaluate the credibility of witnesses, make its own subjective determination of guilt or innocence, or otherwise substitute its opinion for that of the jury. *See id.* at 318–19 & n.13; *see also United States v. Fisher,* 648 F.3d 442, 450 (6th Cir. 2011) (citing *Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009)); *York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v. Metrish,* 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)); *see also Fisher*, 648 F.3d at 450. Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the petitioner is guilty of the charged crime. *Newman,* 543 F.3d at 796–97 (and Sixth Circuit cases cited therein).

Moreover, federal habeas review of a claim challenging the sufficiency of the evidence is even further limited. As the Sixth Circuit explained in *Brown*, 567 F.3d at 205, the federal habeas court is "bound by two layers of deference to groups who might view facts differently than [the habeas court] would." The federal habeas court must defer not only to the trier of fact's findings as required by *Jackson*, but under 28 U.S.C. § 2254(d), must also "defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis

11

in original); *see also Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011); *Anderson v. Trombley*, 451 F. App'x 469, 474-75 (6th Cir. 2011). Therefore, as the Sixth Circuit went on to emphasize in *Brown*:

> [W]e cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt. We cannot even inquire whether *any* rational trier of fact would conclude that petitioner . . . is guilty of the offenses for which he was charged. Instead, we must determine whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial.

*Brown,* 567 F.3d at 205 (emphasis in original).

Applying the double-layer deferential standard to the case-at-hand, the undersigned is convinced that the Ohio Court of Appeals' sufficiency determination is neither contrary to nor an unreasonable application of *Jackson*. In petitioner's sole ground for relief, he claims that the prosecution failed to present sufficient evidence to find him guilty on a theory of complicity. Specifically, petitioner contends that there was insufficient evidence that he acted purposefully to facilitate the murder, burglary, and aggravated robbery, and to prove foreknowledge of the guns used by his codefendants. (*See* Doc. 1 at PageID 2). However, after review of the entire record, the undersigned finds that the Ohio courts reasonably determined that sufficient evidence was presented to sustain his convictions.

A conviction under Ohio's felony murder statute, Ohio Rev. Code § 2903.02(B), requires the prosecution to prove beyond a reasonable doubt that petitioner caused the death of another as a proximate result of committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04. The mens rea element for felony murder is established by the underlying, predicate offense. *See State v. Fry*, 926 N.E.2d 1239, 1253 (Ohio 2010) ("a person commits felony murder pursuant to R.C.

2903.02(B) by proximately causing another's death while possessing the mens rea element set forth in the underlying felony offense. In other words, the predicate offense contains the mens rea element for felony murder.").[2]

Petitioner was charged with the underlying felonies of aggravated burglary and aggravated robbery under Ohio Rev. Code §§ 2911.11(A)(2) and 2911.01(A)(1), respectively. Aggravated burglary under § 2929.11(A)(2) states that "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure . . . when another person other than an accomplice of the offender is present, with purpose to commit in the structure . . . any criminal offense" where "[t]he offender has a deadly weapon or dangerous ordinance on or about the offender's person or under the offender's control." The aggravated robbery statute states "[n]o person, in attempting or committing a theft offense . . . or in fleeing immediately after the attempt or offense shall . . . have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate the offender possess it, or use it." Ohio Rev. Code § 2911.01(A)(1). With respect to intent, "the deadly-weapon element of aggravated robbery in R.C. 2911.01(A)(1) does not require a mens rea . . . no intent beyond

---

[2] In petitioner's motion for certification, petitioner argued that if the Ohio Supreme Court answered the certified question in his favor—finding that the State was required to prove foreknowledge of the underlying offense, the culpable mental state from the underlying offense, and intent to facilitate the underlying offense in order to find petitioner guilty on a theory of complicity—that this Court would be required to evaluate the record to determine if any rational juror could have found "(i) that Eacholes had foreknowledge of his co-defendants' murder scheme, (ii) that Eacholes' aiding and abetting was intended to facilitate those murders; and (iii) that Eacholes had foreknowledge of the gun that would be used in the robbery and burglary." (Doc. 13 at PageID 865). However, because felony murder does not require proof of intent to commit a murder, *see State v. Miller,* 775 N.E.2d 498, ¶ 31–33 (Ohio 2002) (defendant may be found guilty of felony murder even if there was no intent to cause the victim's death), but only that the offender had the intent required for the underlying felony, petitioner did not need to have foreknowledge of a murder scheme or intent to facilitate a murder.

Petitioner cites *Musacchio v. United States*, __ U.S. __, 136 S.Ct. 709 (2015), for the proposition that a sufficiency of evidence claim must be measured against the actual offense elements and not erroneous elements charged by a court. (*See* Doc. 13 at PageID 862). As discussed below, unlike the cases relied on by petitioner, the trial court in petitioner's case did not provide erroneous jury instructions in his case. Furthermore, even if the Ohio Supreme Court answered the proposed certified question in his favor, for the reasons stated below, a reasonable juror could have found that petitioner knowingly assisted in the robbery of Slaven, with the intent that a theft offense take place in Slaven's home and with foreknowledge that a gun would be used in the commission of the crime.

that required for the theft offense must be proven." *Gipson v. Sheldon*, 659 F. App'x 871, 878 (6th Cir. 2016) (quoting *State v. Horner*, 935 N.E.2d 26, 33 (Ohio 2010)).

Under Ohio law, petitioner could be convicted of a principal offense if he supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime and shares the criminal intent of the principal. *See State v. Johnson*, 754 N.E. 2d 796, 801 (Ohio 2001). *See also* Ohio Rev. Code § 2923.03.

As noted by the Ohio Court of Appeals, the prosecution presented evidence that petitioner participated in the planning and execution of the robbery, which resulted in the shooting death of the victim. Misty Williams testified that on November 24, 2012, Williams, Frymire, Givens, Gooden, Lovell, and petitioner devised the plan to rob Julian Slaven while at petitioner's home. (Doc. 5-1, Transcript at PageID 276–77, 280–82). According to Williams, the plan was for Williams and Frymire to arrange to buy drugs from Slaven, before Givens, Gooden, and petitioner would rob him:

> The specifics of this plan were that Anthony Givens and Joseph Goodin were going to enter the residen[ce] with a – Joe was going to have the – a gun to the back of Christia while I sat in Julian's room. And they were going to come up the stairs and make it look like a robbery that me and her had nothing to do with. And that Joseph and Anthony were going to basically do like a stickup, scare Julian. And Jerry was going to come in and they were going to rob him for everything he had.

(*Id.* at 284–85).[3] Williams testified that they all rode to Slaven's apartment in a van and parked a couple houses away, before Williams and Frymire entered Slaven's home. (*Id.* at 286, 289). Williams further testified that, once inside, Frymire text messaged petitioner to let him know that they were inside and how many people were in the house. (*Id.* at 291, 294–95). According to

---

[3] Williams later testified that petitioner's role in the robbery was as follows: "He was supposed to be the one to go in the house and ask Julian, you know, where is all your weed, where's your money. And he was going to be the one to get it all. And he wasn't supposed to have a weapon or anything like that." (*Id.* at 308–309). Williams further specified that petitioner "was supposed to give Christia the extra money. And when Christia text him and told Joe and Anthony to go into the house, he was supposed to tell Joe and Anthony that it was okay to go." (*Id.* at 310).

14

Williams, Frymire subsequently let Goodin and Givens into the home and the following events transpired resulting in Slaven's death:

> Then Christia [Frymire] told Julian [Slaven] she had to go to her car to get money because she didn't have enough. She then walked to the front door. And Joseph Goodin and Anthony Givens were there. She opened the door. She turned around. And Joe put a gun to the back of her. Joseph Goodin, Christia Frymire, and Anthony Givens all walked up the stairs to Julian's room. Christia entered the room first with her hands in the air, making it look like she was scared. Joseph Gooden still had the weapon to the back of her. And Anthony Givens had his gun drawn somewhere in the room. I don't remember who he was pointing the gun at, but it was pointed to somebody. And then Christia got put pushed to the side of the room. Joseph Gooden put the gun up to Julian and said you know what this is. And I heard a pop.

(*Id.* at 296–97). Williams testified that petitioner never made it into the house, but was on his way to the front door when they fled Slaven's home and the group returned to petitioner's house. (*Id.* at 298, 300, 324). Williams further testified that Givens took a jar of marijuana from the home and that the drugs were distributed between petitioner, Goodin, and Givens. (*Id.* at 299-300, 302). As noted by the Ohio Court of Appeals and consistent with Williams' testimony, the prosecution presented evidence that at the approximate time of the robbery a text message was sent from Frymire's phone to a phone used by petitioner prior to the robbery and that a glass jar containing Given's fingerprints and Slaven's blood was recovered in a trash can behind petitioner's house. (*Id.* at PageID 502–506, 562–63, 569–70, 576–77).

Based on the above evidence, the undersigned finds that the Ohio Court of Appeals reasonably determined that petitioner's convictions were supported by sufficient evidence. Although petitioner contends insufficient evidence was offered to demonstrate foreknowledge of the use of a weapon, the plan to rob Slaven explicitly included the use of a gun in order to stage a "stickup" robbery. (*See id.* at 284–85). Based on the evidence that petitioner participated in the planning and execution of Slaven's robbery, a reasonable juror could conclude that petitioner had

15

foreknowledge that a gun would be use in the commission of the robbery and was complicit in the offenses.

When viewing all of the evidence in the light most favorable to the prosecution, this Court concludes that the evidence was constitutionally sufficient to sustain petitioner's convictions. As the Ohio Court of Appeals reasonably determined, the prosecution offered sufficient evidence for a rational trier of fact to find that petitioner was complicit in the commission of the charged crimes. The Ohio Court of Appeals' adjudication of petitioner's sufficiency-of-evidence claims involved a reasonable application of the *Jackson* standard and was based on a reasonable determination of the facts in light of the evidence presented at trial. Petitioner is therefore not entitled to habeas relief based upon Ground One of the petition, his sole ground for relief.

The undersigned's opinion is not altered by petitioner's reliance on *State v. Frymire*, No. CA2014-02-034, 2015 WL 240483, *1 (Ohio App. Jan 20, 2015), the case one of petitioner's co-defendants. (*See* Doc. 13 at PageID 873–78). Frymire was charged under the same indictment as petitioner on a theory of complicity. After receiving initial written instructions, the jury submitted questions to the trial court, inquiring whether complicity required that the defendant know that a deadly weapon may be used prior to the offense. On appeal, Frymire challenged the trial court's response to the jury's questions. The Ohio Court of Appeals found that "without knowledge of the existence of the deadly weapon, Frymire could not possibly share the culpability required for the commission of aggravated burglary or aggravated robbery where possession of a deadly weapon was an essential element of those offenses." (*Id.* at PageID 876). The Ohio appeals court therefore found that "the trial court abused its discretion in instructing the jury that foreknowledge that a deadly weapon may be used in the commission of the offenses

16

was not required." (*Id.* at PageID 877).

As argued by respondent, *Frymire* is distinguishable from the instant case because the trial court never provided the jury in petitioner's case with the erroneous instruction presented in *Frymire*.[4] Furthermore, petitioner has not raised a ground for relief challenging the jury instructions in this federal habeas corpus proceeding, nor was such a claim ever raised in the state courts. As detailed above, sufficient evidence was offered in petitioner's case for a rational trier of fact to conclude that petitioner had foreknowledge that a gun would be used in the robbery[5] and was complicit in the commission of the offenses of which he was convicted.

Accordingly, in sum, the undersigned concludes that petitioner is not entitled to habeas relief. Having found that Ground One of the petition is without merit, the petition (Doc. 1) should be **DENIED** with prejudice.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the claims alleged in the petition, which have been addressed on the merits herein, because petitioner has not stated a

---

[4] In *Rosemond v. United States*, __U.S.__, 134 S.Ct. 1240 (2014), the Supreme Court similarly found that the district court erred in instructing the jury that a defendant could be found guilty of complicity to 18 U.S.C. § 924(c), which prohibits using or carrying a firearm during the commission of a drug trafficking crime, if the defendant simply knew that his cohort used a firearm during the commission of the offense. The instruction was erroneous, the *Rosemond* Court reasoned, because aiding and abetting a § 924(c) offense required foreknowledge that one of the defendant's confederates will carry a gun during the commission of the drug trafficking offense. As with *Frymire*, the trial court in petitioner's case did not provide a similar erroneous instruction and the evidence presented at trial was sufficient to demonstrate that petitioner had foreknowledge that a gun would be used in the robbery.

[5] On this basis, *State v. Shabazz*, Case No. 100021, 2014 WL 1775686, at *1 (Oh. Ct. App. May 1, 2014), is also distinguishable from the instant case. In that case, also relied upon by petitioner, the Ohio Court of Appeals found that insufficient evidence was offered to support *Shabazz's* conviction for complicity to aggravated murder and felony murder because there was absolutely no evidence that *Shabazz* had foreknowledge that the principal offender had a gun before a shot was fired. As detailed above, in this case, the prosecution presented sufficient evidence for a reasonable juror to find that petitioner assisted in the planning and execution of a theft offense that explicitly contemplated the use of a gun.

17

"viable claim of the denial of a constitutional right," nor are the issues presented "adequate to deserve encouragement to proceed further." *See Slack v. McDaniel*, 529 U.S. 473, 475 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)). *See also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

    3. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and, therefore, should **DENY** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date: 5/29/2018                              s/ J. Gregory Wehrman
                                                          J. Gregory Wehrman
                                                          United States Magistrate Judge

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

JERRY J. EACHOLES,  
    Petitioner,

vs.

WARDEN, SOUTHEASTERN
CORRECTIONAL INSTITUTION,  
    Respondent.

Case No. 1:16-cv-373

Black, J.  
Wehrman, M.J.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).